IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NATIONAL FIRE INSURANCE )
COMPANY OF HARTFORD; and ) Civ. No. 10-1054
TRANSPORTATION INSURANCE CO., )
)
    Plaintiffs, )

    v.

ROBINSON FANS HOLDINGS, INC.
On its own behalf and as successor to
ROBINSON INDUSTRIES, INC.; and
ROBINSON FANS, INC.,

    Defendants.

## OPINION AND ORDER

### SYNOPSIS

In this declaratory judgment action, Plaintiff insurers, National Fire Insurance Company of Hartford ("National Fire") and Transportation Insurance Company ("Transportation"), seek a declaration of non-coverage for a suit filed against their insured, Robinson, a fan manufacturer, under a Commercial General Liability ("CGL") policy issued by National and a Manufacturers Errors and Omissions ("E & O") policy and Umbrella Policy issued by Transportation.

The dispute arises out of the alleged failure of three industrial fans that Defendant Robinson allegedly designed, manufactured, and sold to Archer-Daniel-Midlands Co. ("ADM"). In the underlying suit, ADM alleged that Robinson, pursuant to contract, provided ADM with certain equipment. ADM contends that the equipment "failed catastrophically." In particular, the underlying Complaint alleges that the equipment "contained design defects causing the failures." The underlying action asserts claims for breaches of contract, express warranty,

implied warranties of fitness for a particular purpose and merchantability, negligence in design. After receiving the initial demand from ADM, Robinson filed a claim under the General Liability policy. National Fire and Transportation responded with a reservation of rights letter, asserting that coverage was not likely available, due to various exclusions and because the failure of a defective product was not an "occurrence" under the policy. National Fire has undertaken to defend Robinson under the CGL policy, subject to that reservation of rights.

Before the Court is Defendant Robinson's Motion for Partial Summary Judgment, solely as to the insurers' duty to defend under both policies. In addition, Plaintiff National Fire has filed a Cross-Motion, as to the same issue. For the following reasons, Defendant's Motion will be denied, in part as moot, and Plaintiff's will be granted.

**OPINION**

**I. SUMMARY JUDGMENT**

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court must examine the facts in a light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F. 2d 946, 949 (3d Cir. 1990). The moving party bears the burden of demonstrating the absence of any genuine issues of material fact. United States v. Omnicare, Inc., 382 F.3d 432 (3d Cir. 2004).

**II. DUTY TO DEFEND**

The parties agree that Pennsylvania law applies to this matter.

"Pennsylvania's courts have taken a relatively broad view in discerning whether a complaint triggers the insurer's duty to defend." Berg Chilling Sys. v. Hull Corp., 70 F. Appx. 620, 624 (3d Cir. 2003). An insurance company's duty to defend a suit against an insured is determined solely on the basis of the allegations of the complaint in the underlying action. St. Paul Surplus Lines Insurance Co. v. 1401 Dixon's Inc., 582 F. Supp. 865, 867 (E.D. Pa. 1984). That duty "is broader than the duty to indemnify, in that the former duty arises whenever an underlying complaint may 'potentially' come within the insurance coverage." Frog, Switch & Mfg.,193 F.3d 742, 746 (3d Cir. 1999).[1] If the underlying complaint contains more than one cause of action, and one of them would constitute a claim within the scope of the policy's coverage, the insurer must defend the complaint until it can confine the claim to a recovery excluded from the scope of the policy. American States v. Maryland Cas., 628 A.2d 880, 887 (Pa. Super. Ct. 1993).[2] Conversely, an insurer is not required to defend a claim when it is apparent on the face of the complaint that none of the injuries fall within the purview of the insurance policy. Peerless Ins. Co. v. Brooks Sys. Corp., 617 F. Supp. 2d 348, 356 (E.D. Pa. 2008). Under these standards, the cause of action pleaded in the underlying complaint is not determinative; instead, the Court must look to the facts pleaded therein. Mutual Beneficial Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999). Moreover, insurance policies are to be interpreted

---

[1] "Whereas the duty to defend arises whenever the complaint filed by the injured party may fall within the scope of the policy's coverage, the duty to indemnify is more limited because it arises only if it is established that the insured's damages are actually covered by the terms of the policy." Allstate Ins. Co. v. Drumheller, 185 F. App'x 154.

[2] This principle would be inconsistent with the "gist of the action" doctrine, to which Plaintiff refers, when analyzing a duty to defend. That doctrine "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002). Thus, it makes sense that the doctrine does not govern an analysis of duty to defend coverage. Berg Chilling Sys. v. Hull Corp., 70 Fed. Appx. 620, 624 (3d Cir. 2003). Of course, I am not asked here to preclude the underlying plaintiff from asserting its negligent design claim. That is a question for the court presiding over the underlying action; for present purposes, the negligent design claim is present and I must consider it.

according to their plain language. American Legacy Found., RP v. Nat'l Union Fire Ins. Co., 623 F.3d 135, 139 (3d Cir. 2010).

In determining the existence of a duty to defend, the factual allegations of the underlying complaint against the insured are to be liberally construed in favor of the insured, and the court must "resolve all doubts as to coverage in favor of the insured." Westport Ins. Corp. v. Black, Davis & Shue Agency, Inc., 513 F. Supp. 2d 157, 165 (M.D. Pa. 2007). The insured bears the burden of demonstrating that a claim falls within a policy's grant of coverage. Scottsdale Ins. Co. v. City of Easton, 379 Fed. Appx. 139, 143 (3d Cir. 2010).

## III. THE PARTIES' MOTIONS

### A. National Fire CGL Policy

As a threshold matter, the parties' cross-motions center on the issue of whether the allegations in the underlying suit describe an "occurrence" that triggers the Plaintiff-insurer's duty to defend under National Fire CGL Policy.[3] Plaintiff contends that the suit is based on a claim of faulty workmanship, which does not constitute an "occurrence" under applicable law. Defendant, in turn, argues that the alleged catastrophic failure of the equipment constituted a coverage-triggering occurrence.

The Policy reads, in pertinent part, as follows:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

---

[3] I emphasize that the parties have raised and briefed this very narrow issue. Although I would typically continue to an analysis of whether any other Policy provisions impact the insurer's defense obligation, I cannot do so now due to the posture of the parties' Cross-Motions.

4

The Policy further provides that it applies to property damage "only if" the damage "is cause by an 'occurrence'…." "Occurrence," in turn, is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Accident" is not defined by the policy, but its import is well-established.[4] "'[A]ccident,' as ordinarily used, is 'an unexpected and undesirable event, or something that occurs unexpectedly or unintentionally,' with '[t]he key term in the ordinary definition of 'accident' [being] unexpected,'' which 'implies a degree of fortuity.'" Kvaerner, 908 A.2d at 898.

> [T]he definition of "accident" required to establish an "occurrence" under the policies cannot be satisfied by claims based upon faulty workmanship. Such claims simply do not present the degree of fortuity contemplated by the ordinary definition of "accident" or its common judicial construction in this context. To hold otherwise would be to convert a policy for insurance into a performance bond. We are unwilling to do so, especially since such protections are already readily available for the protection of contractors.
>
> ***
> Pennsylvania law interprets "occurrence" based coverage…in accordance with its literal text. In order for a claim to trigger coverage, there must be a causal nexus between the property damage and an "occurrence," i.e., a fortuitous event. Faulty workmanship, even when cast as a negligence claim, does not constitute such an event; nor do natural and foreseeable events….

Specialty Surfaces Int'l v. Cont'l Cas. Co., 609 F.3d 223, 230-231 (3d Cir. 2010) (quoting Kvaerner Metals Division of Kvaerner U.S., Inc. v. Commercial Union Insurance Co., 908 A.2d 888 (Pa. 2006)).

In Pennsylvania, therefore, a general liability policy protects against "essentially accidental injury," and not contract disputes. Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F. 3d 591, 598 (3d Cir. 2009). Accordingly, "Pennsylvania law does not recognize the applicability of a general liability policy to breach of contract… claims." Pennsylvania Mfrs.' Ass'n Ins. Co.

---

[4] Otherwise stated, an "accident" is "an unplanned and unfortunate event that results in damage [or] injury…." Encarta Dictionary, Microsoft Word.

5

v. L.B. Smith, Inc., 831 A.2d 1178, 1181 (Pa. Super. Ct. 2003). "'Provisions of a general liability policy provide coverage [] if the insured work or product actively malfunctions, causing injury to an individual or damage to another's property.' …Such policies are intended to protect against limited risks and are not intended to act as performance bonds." Ryan Homes v. Home Indem. Co., 647 A. 2d 939, 942 (Pa. Super. Ct. 1994).[5]

Thus, just as the term "negligence" cannot per se convert a contract into a tort claim, the presence of a contract, or breach of contract claim, does not inevitably convert every related claim into one of "faulty workmanship." Instead, there is a discernible distinction between a product that actively malfunctions, which could give rise to an "accident," and flawed product-related work done in performance of a contract, which cannot. Cases suggest a material difference between a claim that stems from a "breach[] [of] duty imposed by mutual consensus" -- or an alleged failure to live up to bargained-for standards -- and one that stems from breaches of standards of care imposed by law as a matter of social policy, independent of the parties' bargain. See CPB Int'l, 2007 U.S. Dist. LEXIS 86506, at *19. The former constitutes uncovered "contractual claims of poor workmanship," even if couched as negligence; the latter, however, may be a covered "active malfunction." Cf. Erie Ins. Exchange v. Abbott Furnace Co., 972 A. 2d 1232, 1238 (Pa. Super. Ct. 2009) (emphasis in original). In other words, negligent or defective design, in a case in which the product is designed pursuant to and in accordance with a contract, is necessarily part and parcel of the contract performance. In contrast, if a product was negligently or defectively designed, and then supplied pursuant to a

---

[5] Defendant focuses on the allegation that the equipment "failed catastrophically," a phrase which brings with it an air of the unexpected. In their plain terms, these words might, but do not necessarily, denote an "accident." "Catastrophic," meaning "disastrous" or "awful," does not refer to fortuity. Encarta Dictionary, Microsoft Word. "Failed," in this context, refers to a breakdown. Id.

6

subsequent contract, the design work might be measured against tort standards of care rather than agreed-upon terms.[6]

This distinction is consistently borne out by the caselaw. For example, in <u>Kvaerner Metals Div. of Kvaerner United States, Inc. v. Commercial Ins. Co.</u>, 908 A.2d 888 (Pa. 2006), the court considered policy language identical to that at issue in this case. There, the insured contracted with a third party to design and construct a coke oven battery; moreover, in the contract, the insured warranted that its equipment and work would be free from defect, and agreed to repair or replace any defective work or materials. <u>Id.</u> at 891. The underlying complaint alleged that the construction of the coke battery "was in breach of the Contract and its warranties," and incorporated a list of "workmanship related irregularities." <u>Id.</u> at 900. Accordingly, as a matter of factual allegation, the underlying claims in <u>Kvaerner</u> sounded not in the breach of standards external to the contract, but in faulty workmanship -- that is, failures in the manner in which the contract was performed.[7]

Similarly, <u>Specialty Surfaces Int'l v. v. Cont'l Cas. Co.</u>, 609 F.3d 223 (3d Cir. Pa. 2010), involved occurrence-based coverage for a suit alleging that a subcontractor was to construct and install synthetic turf fields created by a manufacturer, and to install drainage systems. <u>Id.</u> at 227. The underlying complaint asserted that the manufacturer breached its warranties, by failing to timely make good on defects in the fields and workmanship. <u>Id.</u> at 228. It also explicitly asserted a "negligence" claim, alleging that the contractor and subcontractor -- but not the manufacturer -- failed to correctly design the field in compliance with contract documents.[8] <u>Id.</u>

---

[6] Moreover, while the faulty workmanship alone is not covered, faulty workmanship that causes an accident may lead to coverage. <u>L-J, Inc. v. Bitumous Fire and Marine Insurance Co</u>., 567 S.E. 2d 489, 492-493 (S.C. 2002).
[7] The underlying complaint in <u>Kaevner</u> mentioned possibly extracontractual standards, but explicitly tied those standards to contract performance.
[8] The subcontractor was a wholly-owned subsidiary of the manufacturer, and the Court of Appeals refers to them collectively. The initial complaint asserted against the manufacturer pleaded only a breach of contract, for failing to

7

Thus, faulty design claims were asserted under the parties' contract, as an alleged failure to live up to the contract. and were not asserted against the product's manufacturer. In other words, the claims alleged were factually tied to faulty workmanship in performance of the contract, and not to the manufacturer's independent, pre-contractual duties regarding design of the product. [9]

In accordance with these outcomes, other cases have found that an alleged breach of non-contractual duty, in an otherwise contractual matter, could give rise to a covered "occurrence." For example, in Lang Tendons, Inc. v. Northern Ins. Co. of NY, No. 00-2030, 2001 U.S. Dist. LEXIS 2358 (M.D. Pa. Mar. 7, 2001), the court considered the policy language like that presently at issue, in a case involving a contract to supply a cable barrier system for a parking garage, and the alleged failure of the system. The court found that allegations of negligent design, inter alia, presumably predated the contract and did not depend on a contractual relationship. Id. at *21. In doing so, it stated as follows:

> [I]f [the insured's] materials caused damage due to a defect that reasonably should have been avoided or discovered through reasonable….design procedures, then [the insured] could still be held liable for such damages based on traditional common law negligence principles. The claims [in the underlying complaint] are certainly broad enough to encompass this kind of "active malfunctioning" of [the insured's] product.

Id. at *21-22.

It was not, the court noted, "obvious that the negligence claims in the underlying complaint only illuminate ways in which [the insured] failed to perform under the contract." Id. at 22.

---

timely rectify defects in materials and workmanship. Specialty Surfaces, 609 F. 3d at 238. The amended complaint also pleaded negligence against a company that provided a drainage system.
[9]In Specialty Surfaces, the subcontractor was a wholly-owned subsidiary of the manufacturer, and the two are referred to collectively in the opinion. See, e.g., Speciality Surfaces, 2009 U.S. Dist. LEXIS 43702. In Specialty Surfaces and Peerless, the policies contained the same definition of "occurrence" as in the present policy. Specialty Surfaces, 609 F.3d at 227. The plaintiff in that case alleged defects in materials and workmanship. Id. at 338.

8

Similarly, in Schuykill Stone Corp. v. State Auto Mut. Ins. Co., 735 F. Supp. 2d 150 (D.N.J. 2010), the court applied Pennsylvania law to an alleged breach of duties other than those imposed by the insured's contractual relationship, and found occurrence-based coverage under policy language identical to that in the case at bar. At issue was the insured's allegedly defective design and construction of homes. Id. at 153. The underlying complaint alleged, inter alia, violation of contract documents, implied and express warranties, and industry standards. Id. The court found that negligent failure to comply with industry standards, as opposed to contractual standards, "is the definition of 'accident.'" Id. at 158.

Other cases following Pennsylvania law regarding the happening of a general liability "occurrence" follow this pattern; the source of the duty allegedly breached influences whether the underlying action states a covered "occurrence." See, e.g., Abbott Furnace Co., 972 A.2d at 1239 (no occurrence-based coverage for negligence claim where insured was advised of "specific needs and intended use" and injury resulted from insured's "contractual breach in failing to design the furnace in accordance with…requested needs and intended use."); Wasau Underwriters Ins. Co. v. State Auto. Mut. Ins. Co., 557 F. Supp. 2d 502, 515 (D.N.J. 2008) (possible "occurrence" when alleged breach of standards implied by law, rather than bargained-for terms); Keystone Filler & Mfg. Co., Inc. v. American Mining Ins. Co., 179 F. Supp. 2d 432 (M.D. Pa. 2002) (no "occurrence" because product was manufactured in a way that did not conform to purchaser's requirements).[10]

---

[10] I take separate note of Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F. 3d 591, 596 (3d Cir. 2009), which at first glance might appear to compromise this pattern. In CPB Int'l, the insured allegedly provided defective nutritional supplement, of improper composition, to a third party. Pursuant to the parties' purchase agreement, the insured "promised to deliver products of the highest industry standards." Id. at 594. Citing Kvaerner, the court stated that the claim "is an allegation of faulty workmanship that is not covered by the policy, although the workmanship involved here is a failure to perform quality control as to the product to be delivered…." Id. Because the insured conceded that such a claim would not trigger occurrence-based coverage, however, the court engaged in no analysis. Nevertheless, the finding of non-coverage is consistent with the cases discussed in the body of this Opinion. In CPB, industry standards were expressly made part of the parties' agreement, and thus the failure to

9

In this case, the allegations in the underlying complaint resemble those in <u>Lang Tendons</u> and <u>Schuylkill</u>, and are different from those in <u>Kvaerner</u> and its progeny. Here, the underlying complaint states a claim entitled, "negligence in design." In so doing, it avers that the insured "agreed to provide" equipment that conformed with ADM's performance specifications; "designed" the equipment, at some unspecified point in the case chronology; and "selected materials for and manufactured the equipment." Further, the complaint states that the "negligence" and "design defects" caused "catastrophic failure" of the equipment. The complaint lacks any factual allegation that the insured undertook to design the equipment pursuant to mutual consensus or agreement, or instead, for example, supplied a fan designed long before Robinson and ADM contracted.[11]

Therefore, there is no basis for decisively concluding either that the complaint alleges failure to exercise care in duties imposed by contract, or those imposed extra-contractually by law. One possibility is equally as likely as the other. This is not a case in which a "negligence" label is pasted over clear allegations of failure to live up to contractual terms. Although it may ultimately prove otherwise, the four corners of the complaint -- to which the relevant inquiry is bound -- potentially point to a breach of duty imposed by law via social policy, and independent of the contract, which caused the catastrophic failure.[12] I cannot rule out the possibility that something other than faulty workmanship is blamed for the equipment failure. Therefore, because I must liberally construe the underlying complaint in favor of the insured, I conclude that it possibly pleads a triggering "occurrence," rather than faulty workmanship.

---

abide with those standards constituted faulty performance of the contract, rather than breach of an extracontractual obligation.

[11] Although Count II alleges that ADM relied on the insured's judgment to "design, manufacture, assemble, and sell" appropriate equipment, which could imply design pursuant to agreement, that implication is not enough to anchor the claim securely in faulty workmanship, as contemplated by precedent.

[12] I note, too, that the term "catastrophic failure" connotes an active malfunction. "Failure" suggests "an occasion when something stops working or stops working adequately," or a breakdown.

### B. Transportation E & O Policy

Next, the parties dispute whether Transportation Insurance has a duty to defend under the E & O policy issued to Defendant. Initially, Transportation contends that the Motion is premature, because it is, in fact, providing a defense to the underlying action under a reservation of rights; in addition, Transportation contends that the underlying action does not seek damages for "loss of use," as covered by the policy, and also may be subject to various exclusions.

The parties' submissions appear to conflate the question of an insurer's initial duty to defend with that of the extent or continuation of the duty. The initial duty, to which Plaintiff refers, relies solely on the allegations of the underlying action and the policy itself. The duty, however, ends if "the insurer can confine the claim to recovery that is not within the scope of coverage." Britamco Underwriters, Inc., v. C.J.H. Inc., 845 F. Supp. 1090, 1093-94 (E.D.Pa. 1994). Defendant does not contest this proposition; Plaintiff believes that, eventually, it will so confine the claim. Plaintiff is, however, presently providing a defense to the underlying action pursuant to the E & O policy. If it continues to defend the matter, its duty will be moot once the underlying action concludes. See Terra Nova Ins. Co. v. Barr, 887 F. 2d 1213, 1219 (3d Cir. 1989).

The ripeness doctrine is concerned with whether a party has brought an action prematurely. Pittsburgh Mack Sales & Serv. V. International Union of Op. Eng'rs, 580 F. 3d 185, 190 (3d Cir. 2009). In the declaratory judgment context, to protect against a future event, a Plaintiff must demonstrate that the probability of that future event is real and substantial. Id. Moreover, in this context, a court should consider the practical help, or utility, of its judgment. Id. At this juncture, despite Defendant's fears, one cannot predict whether Plaintiff will withdraw its defense prior to that conclusion. The fact that National Fire withdrew a defense

under the CGL Policy does not mean that Transportation will follow suit under the E & O Policy. Both parties agree that Plaintiff has shouldered the initial duty to defend. Moreover, in the context of this action and the underlying action, the practical help of a decision is questionable. The Motion will be denied, without prejudice, as unripe.

## CONCLUSION

In sum, construing the underlying complaint liberally in favor of Defendant, I cannot rule out the possibility that it alleges an "occurrence" sufficient to trigger the duty to defend. Therefore, the Defendant's Motion will be granted to that extent, and the Plaintiff's denied. With respect to the Transportation E & O policy, Plaintiff has already undertaken to provide a defense, which is the relief sought by Defendant's Motion. Thus, that aspect of the Defendant's Motion is unripe, and will be denied accordingly. An appropriate Order follows.

## ORDER

AND NOW, this 7th day of April, 2011, it is hereby ORDERED, ADJUDGED, and DECREED that Defendant's Motion for Partial Summary Judgment (Docket No. [21]) is GRANTED in part, solely to the extent stated in the forgoing Opinion, and DENIED in part, without prejudice, as unripe. Plaintiff's Cross-Motion for Partial Summary Judgment (Docket No. [33]) is DENIED.

BY THE COURT

/s/Donetta W. Ambrose

Donetta W. Ambrose, Senior District Judge